Your Honors, may it please the Court, Counsel, my name is Michael Levine and I represent Mr. Ben-Sholom. My co-counsel is Michael Snedeker. With the Court's permission, we're going to divide our argument. I'm going to take eight minutes to address the mental state issues and Mr. Snedeker is going to address the exhaustion and the statutory challenge to the California death penalty statute. Go ahead. Right at the outset, can you let us know where the case stands today, which may speak to whether there's anything to hear on the death penalty statute? Where the case stands today is that the death penalty was vacated. Judge Ishii vacated the death penalty. The government did not appeal. Is that what the Court's asking? And what's happened since back in the State Court? The government has – Well, let him address that. Where we are now, Your Honor, is that the Tulare County district attorney has announced his intention to retry Mr. Ben-Sholom. We'd be happy to abandon our challenge to the statute if it would not have any possible application to us, but I don't want to require my client to endure the stress of a death penalty trial, and then after that, should he lose, reappear before this Court. Well, when it's your turn, we can address that, but I think there's some question as to whether that's ripe at this stage for a decision by this Court, given the posture that in this case it's vacated. You may want to flip your sequence, because that's what's on our mind. That's what's on our mind. I mean, we obviously want to hear about the mental state, because that goes to whether there will ever be another trial. But we might as well start with whether this is really ripe at this stage for the Court. Well, Your Honor, I initially thought that if they don't want to proceed, then of course it's not ripe, and I don't want to do an abstract challenge to the statute. But the Tulare County, as part of the excerpts of record, I think early on, on page 23, you'll find a formal statement by the district attorney's office of an intent to retry. They may or may not carry it out. Well, how long ago was that? How long ago was that statement made? It was made at the time we filed our appeal. It's a So it's been a while. I mean, has nothing happened in superior court since then? No, they have agreed to stay all of that until this appeal is resolved. So they're waiting for us. Yes. But if, well, if he proceeds with the trial and no death penalty, if they proceed with a retrial on the penalty phase and there's no death penalty imposed, of course, then any opinion would be advisory in effect. And it just seems to me that given that it's been vacated, that this is almost would be almost like an interlocutory appeal at this stage in advance of a death penalty being on the book. So would you address that, please? Your Honor, I believe that it's not an interlocutory appeal in that on, I think, page 23, we have that formal statement of intent. Now, I like to think that they won't actually do it. I'd like to think that if they did it, we would win. But Mr. Ben Shalom is now in his mid-40s due to the long arc of these cases and in bad health. And a retrial and a death penalty sentence is phenomenally stressful. It's a miserable experience that if this, in fact, this statute sweeps so broadly that it violates Furman and the United States Constitution, he would not have to suffer that. And that's a significant – if I had any promise from any official in Tulare County that they would not proceed, that they would see that I would have been But let me ask you this. I don't disagree with your characterization of such a trial or the impact it has on I am, but why wouldn't that be true of every defendant in one of these cases that they could appeal that issue or make that argument before their case actually resulted in a death penalty? I mean, it would basically open this Court up to that kind of an argument or variations on that argument for everyone on death row who they said they're going to have a trial on the death penalty or any pending defendant who's been charged in a death penalty eligible case. Well, believe me, Your Honor, I think Judge Ishii addressed that in issuing the COA. He pointed to cases in this circuit that allow the grant jurisdiction where someone faces the death penalty. They are allowed to challenge the constitutionality or the validity of that penalty so long as they're facing a future trial. And it's not an abstract or advisory opinion, nor would it be interlocutory. It would be a challenge that would preclude a death penalty trial. And I don't have that case handy, I'm sorry to say, but it was discussed by Judge Ishii. My colleague is burrowing through the papers. Okay. You may continue. While he burrows, I'll make one other note on the issue of exhaustion. Our paper was responsive to their discussion of Walker v. Martin on the issue of whether he conceded that it was exhaustion, so there was a procedural default. But in truth, Walker v. Martin did not pretend to answer the separate question of the independence of the State procedural bar. And Benedict v. Mueller, this Court recognized that the California procedural bars were not independent by the California Supreme Court's own knowledge until August of 1998 in the Robbins case. Now, until that time, the California court acknowledged that their procedural defaults were inextricably wrapped up with federal law as well as state law. And at that point, they declared their determination in the future to make these decisions solely on the basis of state law, or these time bars. So there at August of 1998, and Benedict v. Mueller, this Court recognized that and held that the California timeliness bars were valid as of August of 1998 and prospectively thereafter. All the procedural questions in this case were resolved in 1996 and 97. Let me ask you, perhaps one of the reasons I was led down this ripeness path was in your reply brief, you stated as follows. Appellant recognizes that the prosecutor may not actually proceed to trial. He therefore accepts Respondent's claim that the issue is not right, with the understanding that he can raise it in full before this Court when and if the trial date is set. And so you could seem to me that your very statement to the Court, and maybe that's why I'm surprised you're arguing this, because I read that in your gray reply brief, and then when you popped up to argue, I was like, I was pretty surprised, I guess. So has your position changed? No. If this Court can give me an assurance that the Court isn't in the business of giving you a preface, as you might appreciate. I do, but I don't want to proceed with this discussion if it's – if there's no possibility of a death penalty. But so long as I have a formal statement from the prosecutor that he intends to seek the death against my client, I can't do that. Well, you had that. Nothing's changed since you filed the gray brief, and the gray brief says if you can raise it when and if a trial date is set, and a trial date hasn't been set, so why is it this is something we should entertain right now? Well, then, you may expect me to come back if I don't do it. If they do set a trial date, you may never see me again on this particular case if they drop this case. But if they do set a trial date, I will then ask – I hesitate to abandon what I think is a really solid case. If they set a trial date next week, what would you – what would you do? I would claim they cannot presume – What form do you have for getting before us at that point? A writ of mandamus? It would be – it would have to be some sort of interlocutory appeal. That's true. A writ of mandamus saying that – What grounds would you have for an interlocutory appeal? None that leap to mind, and that's why, since I wrote that, I realized that it may be necessary for me to pursue my claim now, or I may never – But what mechanism do you have for getting it before us now? If it's not right now, it doesn't – I don't understand on this appeal. If it's not right now, it seems to me you have to follow the normal procedures. It depends on the weight and substance of that prosecutor's formal declaration, which we made part of the record, that he does intend to seek death. If that's not – that's why I'm – that's why I'm here on this issue. Well, could you be here – was it appropriate for you to be here or your client to be here, whoever's representing your client, if they were doing an effective job? Way back at the beginning, when the guilt phase ends with a guilty verdict, the penalty phase is looming, you've got exactly the same legal argument that the California statute's overbroad. Would it have been appropriate to get to the Ninth Circuit or to federal court at that moment? We've raised this issue at every opportunity, Your Honor. I remember in 1986 being sensitive to the Eighth Amendment issues in this case, having a client who was 18 years old who killed one person without torture or abuse and had no prior background. I began – we filed this challenge to the statute for overbroadness in 1995 before EDPA and I raised this issue. And I don't fault you for doing so. You had a client at that time who was facing a death sentence. At this moment, you have a client who's facing a penalty phase trial. And that ordinarily is not a case that we entertain. It has to go through the system and have a death sentence imposed before we entertain it. So that's the ripeness issue that I think we're concerned with. Can we take this up at this time? Well, why don't I repair to the – and you talk to Mr. Levine and I will look for Judge Ishii's language and I believe the case that said that I have jurisdiction – hold on. Why don't we do this? Why don't you take a seat? We'll now hear from your co-counsel on the issue of the mental state. And if you have something to add at the end in terms of that language, you can advise us. If it helps, what I've looked for and found, his discussion in the COA order regarding Claim 30 appears at pages 3 and 4, which appear to be ER pages 3 and 4. And I don't see a rightness discussion there. I see a discussion that says the issue is close enough to justify a COA, but there may be some discussion I haven't found yet. Well, Your Honors, I'd like to now turn to the mental state issues. Why don't we do this just – we went backwards. You were going to take 8 minutes. That's what I was going to do. So let's just start the clock, if you don't mind, back at 8 minutes and give you your full amount. Thank you, Your Honor. And I was going to reserve 2 minutes each for rebuttal. Your Honor, Mr. Ben Shalom was entitled to an evidentiary hearing on his claim that Mr. Alexander completely botched the mental state defenses at the guilt phase of the trial. We presented strong evidence that he had a valid defense that he could have raised at the guilt phase, but he didn't. The government concedes incompetence but says, well, we can't sell prejudice because we can't show what kind of defense he could have raised. And Judge Ishii, in his opinion, also says, well, what kind of defense could he have raised? But in the very order that Judge Ishii says – denies the IAC, he gives the very defense that Mr. Alexander could have raised, namely that Mr. Ben Shalom did not have and could not have formed an intent, could not make a rational decision. That's the defense, that he was – Your defense would have been substantial domination? No. No, no. Our defense would have been that he was an automaton, that because of his upbringing, because of his – Okay. And where is that in the California statute? I mean, what defense does that – what is that? Well, it's a defense that's recognized in the case I cited. The name escapes me at the moment. Can you frame it in terms of California statute, Penal Code 190.3? Well, it's a defense that is not a statutory defense, but there has to be an act and there has to be an intent. Every crime has an act and an intent. Well, one of the focuses before, of course, was to teach confessions. Well, the confession was to the act. There's no question that he committed the act. That's not in dispute. The question is, what was the state of mind? The judge instructed the jury at the trial that there had to be – But, I mean, the confession goes to more than the act. The confession describes an intent, really, in terms of, you know, going in, the plans, what was going to happen. Yes. I mean, you can't really separate, like – it's like I landed at somebody's house. That's not what he said. He said, no, I – we made the plan. Here's what I was going to do. Here's why I was going to do it. Yes, but you – yes, I agree. Why isn't that kind of take the rug out from under your argument? Because you didn't hear the actual sound of the confession that Dr. Winbrant, the only psychiatrist, to actually hear and listen to that confession. When you do, what you hear is a flat, monotonic, robot-like, hypnotic-like statement of a person who is clearly in fantasy land, is clearly deeply disturbed, mentally ill, and is acting like a robot. You hear a robot-like statement. Yes, the words – the words are saying things. I did this. I did this. But the manner of how it's being said, the way it's being said to a psychiatrist, properly trained, says this is a person who is basically having no will of his own. It's a person who is acting as a robot, as it were. But he knew what the purpose of the whole program was. It isn't that I was told to do this. I did it. This was all part of the scheme to go off and fight the bad guys in Burma. If he understands that, why isn't that sufficient to establish intent, no matter the monotone or the fact that he was doing it because he was influenced by somebody else? No, it's not sufficient if he was not, in fact, acting under his own rational will. If he was acting as – and I use the term robot. I use the term automaton. That's the language used in one of the California cases I cited in the footnote to one of the briefs. Weber. I believe it's a California case of Weber. A person does not have intent if there's evidence that he's acting like a robot, an automaton. Now, this is – I'm not suggesting it's an easy case to try to a jury. I'm not suggesting – but with proper psychiatric testimony, as we had here from two highly qualified psychiatrists, Dr. Rienzi, Dr. Winbrandt, and Mr. Alexander had understood the nature of mental state defenses, which he clearly did not, had he presented proper psychiatric testimony, he could have convinced at least one juror, and not necessarily to get an acquittal, to undermine confidence in the case, convince at least one juror to come in even with a lesser-included offense besides first-degree felony murder, to come in with a hung jury as a victory for the defense, to come in even with an acquittal. These – instead, he did nothing. He did nothing. Now, this – he had – and a competent defense attorney would and could have fashioned this defense and presented it to a jury. He did not. We have – we have the very strong testimony of two psychiatrists, well qualified, saying that their examination of the entire record, the entire history of Ben Shalom, listening to the tape, looking at all of his dissociation, which is a form of psychosis, according to Winbrandt, is – Counsel, both – both Dr. Rienzi and Dr. Winbrandt also concluded that Ben Shalom was incompetent to assist his counsel at trial. Yes. They should not have even stood trial. Well, they didn't. That was – that was quite disputed by his attorney. Yes. And the district court doesn't buy it either. That's true. So you have – you have some trouble here that you have psychologists who have been  with the defendant and by the judge who's heard all of – all of the evidence. Nobody else seemed to think that – that Ben Shalom was – was incompetent at the time that he was tried. Well – well, first of all, Your Honor, with respect to incompetence, that, of course, is a different issue, but turning to that, you have to – you have to take Mr. Alexander's assessment with a grain of salt, because he's already been found to be ineffective with respect to his handling of the mental state evidence with regards to the penalty case. By his own admission, he couldn't grasp the mental state theories. He couldn't understand, by his own – But he had – but this was an experienced public defender. This was his, I think, 10th or 11th capital case. Well, it was a supposedly experienced public defender, but the fact is, by his own admission and his affidavit and his testimony, he never got at what was – what was the problem with Mr. Ben Shalom. He admits that he mishandled the mental state defense. He admits that he didn't – what kind of experienced public defender doesn't give his mental health psychiatrists, all the people he hired, all the background information? He deliberately withholds background information. If this is experience, this is terrible experience. You know, experience by itself doesn't mean anything if you don't learn from your mistakes. Well, you could say that was an error. I mean, it was kind of wishful thinking. He said he was going to give him a clean slate. A clean – a clean. I mean, he was going to get a clean report, whatever that is. A clean report, but so that may be, you know, misguided at the least, but it might also just be pure ineffective assistance of counsel in that state. Well, it was. It was ineffective assistance. Well, then you shifted it. Well, but this is the lawyer that we're asking about, why should we – why should we credit him when he says, oh, my client was perfectly competent? You know, for a lawyer to talk – just because he was – he comes in and talks to a client many times, the fact that a client is talking to a lawyer doesn't mean he's competent, because what is he saying? Here we have – here we have the lawyer saying – We are very – we are very deferential, and have historically been, to counsel's own impression of their clients. We depend on counsel to come forward and tell the judge when they think their client is not competent. And if we're going to give them credit on that, then we also probably need to give them some credit if they said, you know, Your Honor, I sat here and during this time, I thought he was quite – quite able to assist me in his defense. Well, normally that's the case, but this Court has said in the Odell case that while we often do and often – we should defer very often to defense counsel's assessment of competence. That's not necessarily the case. He's not a trained professional. He's not a psychiatrist. He's not a psychologist. And in the Odell case, you had the same thing. You had the lawyer saying, oh, he's competent, he's competent, when it turns out he's not competent. We're not – we're not professional psychiatrists. The fact that someone is saying A, B, C doesn't mean he's competent. And especially where even – even the lawyer here is saying, you know, he's – he's – I can't tell if what he's saying is true or not true. He's exaggerating, but I don't know how he's exaggerating, and I can't figure it out. That's not competent because it's – competence is not just communication. It has to be communication that helps in the defense in some way. It has to be communication that assists the lawyer. If you have a client who's – who's going like this, going like that, that's not assisting the lawyer in preparing the defense. As a matter of fact, we can see what happens with the defense. He totally botched the defense in every – in every way. So – and then now you have two – two very strong psychiatrists going through a lengthy history showing and concluding that he was not competent in the sense that – only in the second sense, that he could not communicate with his lawyer to the extent of helping his lawyer. He could not communicate and help his lawyer with the defense. He could not communicate and help the psychiatrists that the – and the experts that the – that the lawyer hired. So also, you have to think about, with all due respect to Mr. Alexander, his interest in not wanting to now come back and say, you know, I screwed that up, too. There were – I did have some qualms about it. I just – because, as this Court said in Manning v. Foster, lawyers have an incentive not to admit their own ineffectiveness for various reasons. So I think we have to discount. And I think that you have to discount. Roberts. On the other hand, Mr. Alexander's been quite forthright that he believes that he did. He did in that respect. He did in that respect, but he seemed – he seemed much more, oh, no, on competence. That's my – I know someone who's – when he's competent and when he's not competent. But he clearly did not. And in my – Thank you. You've exceeded your time. We'll hear from the State. Thank you, Your Honor. Good morning. If it please the Court, Louis Martinez, appearing for the people. As to the rightness issue, I'd simply reiterate what's been said in the briefs, that the death penalty hasn't yet been imposed again on Mr. Shalom. As – if it is imposed at some point in the future and he believes wrongly so, then he has his remedies through the State courts. And then if he exhausts those, then he could come back to this Court. As to the intent issue, the people would submit that the confession is virtually conclusive as to that issue. Mr. Shalom explained very clearly what he did and he explained why he did it. He explained that he did it – he entered the house with the intent of taking the weapons. He pointed the gun at Ms. Teague, the controller. Later, he was given the order to sort of do away with Ms. – Ms. Teague, eliminate any witnesses, and he did so. He did so actually of his own volition with – he shot Ms. Teague with the idea of instantaneously causing death, which is not something he was ordered to do, or at least there's no indication in the record he was ordered to do that. He simply came up with that on his own. So very clearly, he was able to form his own sort of intent to perform actions. How do you respond to counsel's argument that he said all of this, but if you look at how he said it in a way that really, as he described it, was like an automaton coupled with the psychiatrist's explanation of what that means, that you really can't take the words or what they say because they're coming out of the mouth of somebody who doesn't really have this ability to perceive and to be able to form this kind of intent? Well, I think the basic problem that there is with that assertion is I believe there's a misapprehension on the part of the psychiatrist as to what the law is regarding intent. If we look at the declarations of the psychiatrist, they're focused on the fact that Mr. Shalom or Ben Shalom appears to be following the orders of others or doing what others tell him to do, and I have no knowledge of any requirement in the law as to whether you're following the orders of others or whether you come up with the idea on your own. The question is simply whether you can form the intent. In other words, when he shot the gun, did he act with the intent of killing Ms. Teague? And that was very simply what he was doing. He admitted to doing it very clearly. So I think whether he was monotonal or acting as a tool of the others is simply not, it's not a legal question that California would have recognized in 85. I believe it was in probably 82 or 83 that California removed the defense of being unable to comply with the comports of the law. And once that went away, then that issue would sort of be moot. It's interesting to look at the second confession, the start of the second confession. Appellant would appear to characterize himself as being sort of led along by leading questions, but the first thing he does in the second confession is he asks, can I have money released so I can have razors and soap and things? And that would indicate to a respondent, at least, that he's not just acting as an automaton. He's somebody who's very willing to look after his own interests. As to the second issue, I'd be happy to answer any courts, any questions the Court might have on the substantive issues there. But otherwise, we'll move on to the third issue. All right. As to competence, again, as the Court's questioning brought out, counsel asserted in his declaration that, in his opinion, Mr. Shalom was competent. And, in fact, that certainly would have been supported by the record. Mr. Shalom, in fact, testified, and the testimonial, the brief, was quite responsive to the questions. And it was, in respondent's view, pertaining to things that might rationally be related to defense. He talked about the remorse that he felt, and he explained why he didn't express that remorse earlier. He talked about the novels he was reading, and he talked about the fact that he was studying German, and that he wanted to study several different subjects. That certainly wouldn't indicate somebody who was unaware of what was going on, or unable to respond to counsel's questions, quite the reverse. And, in fact, although Mr. Shalom now claims that he was an unreliable historian, in fact, the statements that he gave to law enforcement officers were quite accurate. And that's not just my characterization. That was the characterization of one of the officers who testified. And it was very responsive to the questions, but also it brought forth the details about the Burma Liberation, or Karen Liberation Army, and things that the officers didn't ask him about until he brought up the subject. So it's, given that together, it would seem that certainly counsel had very good reason for concluding he was competent. The one thing I would mention on that is Hernandez v. Ilse. There was a similar situation where the defendant made some pretty strange allegations of mistreatment. And the doctors who examined him, and they didn't examine him, didn't offer any question, any opinion to his competency at the time, which I believe is the same situation here. And yet, in that situation, it wasn't error for the trial court to not hold the competency hearing. And the one special comment I would make about that in the reply brief, respondent read that, is almost saying that there was an evidentiary hearing in Hernandez v. Ilse, and perhaps I misread appellant's reply brief. But in fact, there was no, I don't believe there was a evidentiary hearing held in Ilse. And that's at page 716 of the opinion. And again, that's 930 F. 2nd at 716. So other than that, I'd be happy to answer any questions the Court might have. And I think there are no further questions. Thank you. Thank you. Gentlemen, you've used your time, but I'm going to give you a minute for rebuttal on the substantive merits of the mental capacity. And then also, Mr. Snedeker, if you had anything further on the ripeness issue, I would also give you a minute for that as well. The State talked about my client's testimony to show that he was competent. But part of the testimony was that the client said, and this is now in his testimony for his life, in the penalty phase, he said he'd been, when asked what he'd been doing with his time, he said he'd been reading horror stories. The Court will check the transcript. Which illustrates, I think, an utter lack of communication between the attorney and the client. I could hardly imagine anything more detrimental and ineffective in eliciting from your client that while you're on death row, you're after having been convicted of a heinous murder, that you're reading horror stories. Dr. Winbrandt's declaration and testimony was to the effect, as well as Rienzi's and so many words, that at the time of the crime, Ben Shalom was suffering, was engaging in magical thinking, that he was in a fantasy world. Magical thinking is a form of psychosis, that he was dissociated from himself. And that he could not and did not have the intent to commit murder or to commit robbery, that he was acting virtually like a machine. It's true that in the initial beginning of the confession, he acted about soap. True. But as soon as it got on to what happened, he slipped into a mode that's literally like a machine. That was a defense that could have been presented to the petite jury. It could have been an instruction, and the jury was instructed. They didn't have to even ask for an instruction. The jury was instructed. They had to find that the defendant committed the act and had the intent. Had that defense been raised with competent psychiatrists, there's a reasonable probability that at least one juror would have voted not guilty, or would have voted for a lesser-included offense, a lesser degree of murder or manslaughter, or there would have been a hung jury. Thank you. Do you have anything to add? Only that I now remember finding a case cited by this circuit saying that you do have jurisdiction to challenge a sentencing scheme if you are subject to being prosecuted. I remember citing it in my application. But let me ask you this. Since you don't know the specific case now, if you find it, you can send us a supplemental letter, of course, with a copy to counsel. I'd be happy to do that, Your Honor. Okay. I appreciate that. I also say, I mean, it's always a sad case when you have someone this young involved here. It's very unusual, of course, to settle a death penalty case. But I might add that it has happened in this Court. And if counsel were to agree and find it appropriate, we certainly would offer the services of the Ninth Circuit mediators to discuss anything with you if that would be appropriate. And we do offer up those services. The case just argued, Venshalom v. Ayers, is submitted. I do thank counsel for your excellent briefing and argument this morning. Thank you very much.
judges: McKeown, Clifton, Bybee